## CHARLOTTE (OF COLOR) vs. CHOUTEAU.

1. Slavery may exist without any positive law authorizing it.

2. The existence of slavery in fact is presumptive evidence of its legality.

3. It is not necessary to shew any general custom in a country of holding negroes in slavery to prove its legality. If it be found to exist in fact even to a limited extent, and no positive law prohibiting it be shewn, it will be deemed legal.

4. It is not the policy of the slave States to favor the liberation of negroes.

*Charlotte (of color)* vs. *Chouteau.*

## APPEAL from St. Louis Circuit Court.

Cobb, *for Appellant, insists:*

1. By virtue of her mother's birth and residence for several years in Montreal in Canada, when and where the custom and usage of slavery did not exist, plaintiff claims her freedom.   Pierre vs. Chouteau, 9 Mo. R., 1; Bacon's Abridg., title Custom; 1 Blackstone, 68 and 76, *et seq.*, 424, and cases there cited; Forbes vs. Cochran, 9 Com. L. R., 145; 2 Greenleaf on Ev., 248, *et seq.*, title Custom; Story's Con. of Laws, 528–96, and cases there cited; Marie Louise vs. Mariot, et al., 8 Lou. R., 475; Forsyth, et al., vs. Nash; 4 Mar. Lou. R., 385; Wilson vs. Isabel, 5 Call R., 425; Wheeler on Slavery, cases cited, 339, 340, 346, 348, 349, 355, 357, 367, 385, 393.

2. Because her mother was taken to Michilimacinack, a British post in the North Western Territory, between 1790 and 1793 or 1794, and held there, when and where the United States of America forbade, and the law of England said it abhorred, the existence of slavery.   See authorities above cited on the law of England; Ordinance of Congress of 13th July, 1787; Orr vs. Hodgson, 4 Wheat., 453; 4 Cond. R., 506, S. C.; Hughes vs. Edwards, et al., 9 Wheat., 300; 5 Cond. R., 648; Homden vs. Fisher, 1 Wheat., 300; 3 Cond. R., 572; Blight's lessees vs. Rochester, 7 Wheat., 535; 5 Cond. R., 335.

3. Because her mother was taken to Prairie du Chien, in the North Western Territory, and held there in 1794, when and where there were no British troops or post within one hundred miles, and the provisions of Jay's treaty could not operate contrary to the law of Congress of 13th July, 1787.   Pierre vs. Chouteau, 9 Mo. R., 1; Jackson vs. Porter, 1 Paine C. C. R., 457, and cases cited above; 1 Mo. R., 334; 2 Mo. R., 19 and 32; 3 Mo. R., 193; 4 Mo. R., 350 and 592.

4. One instance does not constitute a custom or law of slavery, after it is acknowledged, as proved, that the custom, usage or law of slavery did not exist in Canada at a certain time.   This court will not maintain that on proof of one instance of a person being held then and there as a slave, that person was found as a slave; but on the contrary, for that very reason, that person was free.

5. A new trial should have been granted in the cause.   See cases above cited.

6. The two pages in Murray's History of British America, commencing at 71st page of 2nd vol., on the subject of negroes in British America, should not have been excluded from the jury.

7. The judgment of the Circuit Court should be arrested and such judgment given as such court ought to have given.   See cases above cited and Statute.

Spalding & Tiffany, *for Appellee.*

The instructions are numerous, and will be considered in their order, which course will involve the consideration of all the points of law arising in the case, except one, as to admissibility of a part of Murray's History.

1. First instruction given of the court on its own motion.   This instruction directs the jury to find for plaintiff if they think that slavery did not exist in Canada, unless Rose, while she was there, was held in actual slavery there; and it is erroneous against the defendant.

1st. It is objectionable, as it assumes that Rose did not reside in Canada, or was born there, or both.

2nd. If slavery did *not* exist there, and if Rose was legally a slave and brought there, and her owner sojourned there for a time and then removed her, she does not become free; but the instructions assume that by such remaining there she is free, no matter whether she was previously a slave

*Charlotte (of color)* vs. *Chouteau.*

and fled there, or was carried there against her owner's knowledge by a kidnapper, or went with her master thither, and was detained, &c., by unavoidable accident or necessity.

3rd. This instruction is wrong against *the defendant,* but it did no injury to the plaintiff, for it directed the jury to find for plaintiff if Rose acted as free in Canada.

2. The second instruction is in plaintiff's favor, and he cannot object to it. If it did not cover as much as he wished, he should have asked another.

3. This, the third instruction, is likewise in plaintiff's favor, and cannot be objected to by him.

4. The first instruction asked for by plaintiff, directs the jury to find for the plaintiff in case slavery did not exist in Canada—without leaving it to them to enquire whether Rose was born there or resided there.

5. The second instruction of plaintiff is wrong—telling the jury to find for the plaintiff if Rose was held as a slave in North West Territory. 9 Mo. R., 3, Chouteau vs. Pierre. She might have been held there by British subjects, and not set her free.

6. The third of plaintiff's instructions assumes that Jay's treaty had no effect on her if Rose were brought from Prairie du Chien before that treaty. 1 Br. Laws U. S., 206; 8 vol. Stat. U. S. at large, 117, sec. 2, for treaty.

This instruction was useless and irrelevant, as this court decided that the ordinance of 1787 never had any force in the posts and precincts occupied by the British. The treaty, therefore, could not have asserted her rights in any event. The treaty shows the condition of things there, and the date down to which the posts were retained by the British. If Rose resided in the posts held by the British, she was not set free by the ordinance of 1787; and if she resided outside of those posts, the treaty had nothing to do with her; so that the treaty did not affect her in any event.

7. The fourth of plaintiff's instructions directs the jury to find for the plaintiff, if there was no law of Canada authorizing slavery—thus assuming, and not leaving to the jury, the alleged facts that Rose resided in Canada, and with the consent of her master. It certainly is not law that Rose was free merely by the non-existence of legal slavery in Canada. That circumstance could not operate on her condition unless the jury should find certain other facts necessary to exist in order that the laws of Canada should affect her.

8. This, the fifth of plaintiff's instructions, requires the jury to find for plaintiff if there be a doubt whether slavery existed in Canada at the time spoken of by the witnesses, when our statute says that the *burden* is on plaintiff in such cases. Rev. Code of 1835, title Freedom, page 286. *"The time spoken of by the witnesses,"* is also a loose phrase, for they spoke of a great many times from 1787 or earlier down to the time of trial; and some presumption of slavery certainly arose from the long holding of Rose, sale of her, &c., &c.

9. The sixth of plaintiff's instructions is loose and vague, asserting substantially she could not be *property* or a *slave* if the jury find that she was brought and resided in the North West Territory, under the laws of Congress abolishing slavery in said Territory, &c.

Suppose she was brought there by trespassers without owner's consent, she would not then be free. Suppose she was carried thither by her owner, who was merely passing through, and was detained with her by unavoidable necessity—this would not have freed her. Suppose she was taken thither after 1787, and carried to and lived in a British establishment—an Indian trading post in possession of the British—this would not have freed her, yet the instruction assumes that it would.

10. As asked, the plaintiff's instruction numbered eight on my brief, (being "plaintiff's instruction given, modified by the court") was erroneous, for, as matter of law already settled by this court in the case of Pierre, British subjects did have more right to hold slaves in the North West Territory than Americans had; for if they held them there at their posts and precincts, they did not become free. This instruction intends to maintain that the ordinance of 1787 operated throughout the whole Territory, whereas this court holds that it did not operate in those parts of it which the British had not surrendered.

11. The first of defendant's instructions merely stated that neither of the facts therein stated entitled the mother of plaintiff to her freedom, nor did they, unless coupled with other facts; for instance, the fact that the laws prohibited slavery in Canada, and the fact that Rose was not held there even if slavery did not exist there, by a kidnapper, *without knowledge of owner,* &c.

The second of defendant's instructions needs no comment.

Nor does the third, being only a repetition of the statutory provision on the subject.

12. The fourth and fifth relate to the presumption arising from the fact, if the jury should find it, that Rose was held as a slave in Canada, and at the same time other blacks were so held there. On the trial of this case, no law of Canada was proved or attempted to be proved. 9 Mo. R., 3, Pierre vs. Chouteau. And the sixth instruction of defendant given by the court, tells the jury that no *law has been proved to that effect,* and that the burden is on the plaintiff to prove it, as it cannot be presumed. And the seventh is, that plaintiff is bound to prove such law, if necessary, for his case. The testimony shows fact of slaves being held in the place in Canada (Montreal) from which Rose, the mother of plaintiff, was brought. The petition for leave to sue, says that Rose was a negress, and such is the testimony.

13. The eighth instruction of defendant is simply that if Rose was held and sold as a slave in St. Louis, and conveyed as such before the then Lieutenant Governor, in October, 1795, that she is to be considered as a slave, unless the contrary be shown. The ninth and last, is substantially the same, merely altering the eighth so as to leave to the jury to pass on the fact of her being a negress, which was totally unnecessary, as the record contains a sworn admission by the plaintiff that Rose was a negress—a record admission in the case.

14. There was an exception to the ruling of the court in excluding an extract from Murray's History, 2nd vol., page 71, about two pages, which related to slavery, not in Canada, but in some other province. The matter was not evidence; tended neither to prove fact nor law, and if it had proved either, it would not have been fact or law in Canada.

15. Motion for new trial properly overruled.

NAPTON, J., *delivered the opinion of the Court.*

This was a suit for freedom, in which the defendant, Chouteau, obtained a verdict and judgment.

The plaintiff claimed her freedom on two grounds. 1st, because her mother, Rose, was born in Montreal, and, 2nd, on account of the residence of Rose, about the year 1794, at Michilimacinack and Prairie du Chien.

The plaintiff gave evidence tending to show that Rose was born in Canada, and also that slavery never existed in Canada. The defendant gave evidence to show that slavery did in fact exist in Canada. No evidence was given of any law prohibiting or giving sanction to slavery in Canada.

It appeared that Rose was purchased by Didier, curate of the parish of St. Louis, in 1795, from one Andre Todd, a merchant of Montreal, and that Didier sold her and her children to the defendant's father, Auguste Chouteau.

There was evidence to show that Rose, about the year 1794 or '95, was

living as a servant in the family of one Stark at Prairie du Chien, and that two years previous to this, she was seen at Mackinaw.

The court gave the following instructions:

1. " If the jury believe from the evidence that during the time Rose, the mother of plaintiff, resided or remained in the province of Canada, slavery or involuntary servitude did not exist there, either by positive law or by the usage and practice of the inhabitants of that province, they will find the issue for the plaintiff, unless the jury shall believe from the evidence that during the time said Rose remained in said province she was held in slavery or involuntary servitude."

2. " If the jury believe from the evidence that Rose, while she remained in Canada, was held in slavery or involuntary servitude, and that afterwards she was taken to Prairie du Chien, in the North Western Territory, and there held in such servitude after the passage of the ordinance of 1787, and after the possession of Prairie du Chien as a military post had been relinquished by the subjects of Great Britain, in such case the said Rose became free by operation of law, and the jury will find for the plaintiff."

3. " Michilimacinack and Prairie du Chien are both in the North Western Territory, and within the limits of the United States, where slavery was prohibited by the ordinance of Congress passed in 1789."

The court refused to give the following instructions asked by the plaintiff:

1. " If the jury, from the testimony, believe that at the time of the birth, and subsequent to that time and up to the time of the plaintiff's mother leaving Canada, slavery did not exist in said province and was not recognized by the laws of that country as property, then they will find for the plaintiff."

2. " If they believe from the testimony that the plaintiff's mother was a slave in Canada, and was held in servitude in the North Western Territory, north-west of the Ohio river, and within the limits of the United States, she became free by operation of law, and they will find for the plaintiff."

3. " If the jury believe from the testimony that Rose was brought to and kept in the North Western Territory, and brought to Missouri from Prairie du Chien before the ratification of Jay's treaty, in that case the treaty would have no effect upon her."

4. " If they believe from the testimony that there was no law of the government of Canada authorizing the existence of slavery in that country, they will find for the plaintiff."

5. "If the jury believe from the testimony that it is doubtful whether slavery existed in Canada at the time spoken of by the witnesses, the plaintiff is entitled to the benefit of that doubt, for the reason that the policy of civilized governments is in favor of freedom."

6. "The jury are instructed that plaintiff's mother was not the property of any one, if they find that she was brought and resided in the North West Territory under the laws of Congress abolishing slavery in said Territory, except by provisions of said act."

The plaintiff also asked the following instruction:

"The jury are instructed that British subjects or traders residing in North West Territory had no more right to hold a slave in the North West Territory, in defiance of the laws of Congress, than American citizens had." Which the court gave, after it was modified so as to refer to the period after which the British posts in that Territory were relinquished.

At the defendant's request, the court also gave the nine following instructions:

1. "The facts that the mother of the plaintiff was born or held as a slave in Canada, and was at Michilimacinack and Prairie du Chien while these places continued in possession of the subjects of the British Government, do not, nor does either of them, entitle the plaintiff to her freedom."

2. "If the jury find from the evidence that slavery existed in Canada, and that the mother of the plaintiff was there held as a slave, the fact of her residence in Canada, or at other places at the time in possession of the subjects of the British Government, and before the surrender of those places to the American Government, does not entitle the plaintiff to her freedom."

3. "The burden is on the plaintiff in this action to prove her right to freedom."

4. "If the jury believe from the evidence that blacks were actually held in slavery in Canada at the time when Rose lived there, and that she was held and claimed as a slave there, the jury may presume that she was a slave."

5. "If the jury find from the evidence that blacks were actually held in slavery in Canada at the time when Rose lived there, and that she was held and claimed as a slave there, the jury are bound to presume she was a slave, unless the plaintiff has shown some law forbidding slavery there."

6. "That the plaintiff has not given in evidence any law forbidding

negro slavery in Canada, and the jury are not authorized to presume any such law."

7. "That a law forbidding slavery in Canada, if any such existed, is a matter which the plaintiff is bound to prove, if material to her case."

8. "If Rose, the mother of the plaintiff, was, in October, 1795, brought to St. Louis as a slave and conveyed there as such before the Lieutenant Governor of Upper Louisiana, by formal conveyance executed before and authenticated by him, the jury are bound to consider her a slave, unless the contrary is shown."

9. "If the jury find from the evidence that Rose, the mother of the plaintiff, was a negro and was always held in slavery, and was brought to St. Louis and sold there as a slave, and conveyed as such to a citizen there, in October, 1795, by formal conveyance executed before the Lieutenant Governor of Upper Louisiana and authenticated by him, the jury are bound to consider the said Rose as a slave, unless the contrary is shown."

There does not seem to be any question of law involved in this case which has not been already determined in the case of Chouteau vs. Pierre, (9 Mo. R., 1.) The only matter of dispute is, whether the instructions which the court gave at the trial were in accordance with the principles established by that decision.

The point of fact mainly disputed on the trial, was the existence of slavery in Canada. This court had decided, in the case just alluded to, that slavery might *in fact* exist in a British or French province on this continent, without any legislative recognition, either by the colony or the mother country. Hence it followed, that where negroes were found in a state of slavery, the presumption would arise that the Government recognized this condition as legal and warranted by their laws and customs, unless some law could be shown prohibiting it. This presumption was shown to be fully justified by the history of the introduction of slavery upon this continent.

The first instruction given by the court is the one principally objected to, and, we think, not without cause. It seems to be obscure or contradictory, or, if to be understood in one sense, to convey a proposition never intended to be advanced in the case of Chouteau vs. Pierre. The jury are told, that if they believe slavery did not exist in Canada during the period of Rose's residence in that country, they were to find for the plaintiff, *unless they found that Rose was held in slavery*. How could Rose be held in slavery in Canada if slavery had no existence there?— This could not be, unless by the slavery spoken of in connection with Rose, was meant any restraint upon her liberties, however such restraint

might have been condemned by the laws of that country. If this was the meaning of the instruction, it maintains a proposition which is not the law, and is not understood to be deducible from the decision in Chouteau vs. Pierre.

From the phraseology of several of the instructions—both those given by the court and those which the court declined giving—much stress seems to have been placed upon the existence of a *custom* or *usage* of slavery in Canada. It appears to have been inferred from the opinion in Chouteau vs. Pierre, that a usage or custom of slavery must be established to have existed in Canada during Rose's residence there, in order to warrant a verdict for the defendant. Nothing was said about the *usage or custom* in that opinion, and if those terms are to be understood in their legal sense, as implying both generality and length of duration, they are calculated to mislead from the issue which the jury should properly try. It would require no particular familiarity with the history of the British provinces of Canada, to be assured that negro slavery never has been very extensively or generally introduced there. The nature of the climate would have presented insuperable obstacles to a dense slave population. But if negro slavery was introduced into that country in fact, although to a very limited extent, without meeting any opposition from the positive laws or established usages of the government or people, the defendant's rights, acquired in such a condition of things, deserve the protection of our laws and courts, as much as though they had originated in a country where the congeniality of the climate and the richness of the soil encouraged the general propagation of slavery and its recognition by the government.

The instructions asked by the plaintiff need no particular comment.— Their general spirit is not in conformity to the policy of our laws or the principles heretofore adjudicated by our courts. Whatever may be the policy of other governments, it has not been the policy of this State, to favor the liberation of negroes from that condition in which the laws and usages have placed the mass of their species. On the contrary, our statute expressly throws the burden of establishing a right to freedom upon the petitioner, and the provision is both wise and humane. Neither sound policy nor enlightened philanthropy should encourage, in a slaveholding State, the multiplication of a race whose condition could be neither that of freemen nor of slaves, and whose existence and increase, in this anomalous character, without promoting their individual comforts or happiness, tend only to dissatisfy and corrupt those of their own race and color remaining in a state of servitude. Different principles and other

presumptions may be very safely and perhaps very wisely indulged in where the institution of slavery has never existed or has been entirely abolished.

The other Judges concurring, the judgment is reversed and the cause remanded.